# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 40
The People &c.,
   Respondent,
  v.
Richard B. Gaworecki,
   Appellant.

Veronica M. Gorman, for appellant.
Rita M. Basile, for respondent.

FAHEY, J.:

The phrase "mens rea" is fraught with definitional difficulties. It permeates the law

along with

> " 'nonlegal disciplines such as philosophy and psychology,
> perhaps because it captures in a single phrase criminal law's

- 1 -

focus on personal culpability. The modern meaning of mens rea, and the one common in legal usage today, is more narrow: Mens rea describes the state of mind or inattention that, together with its accompanying conduct, the criminal law defines as an offense' " (Black's Law Dictionary 1181 [11th ed 2019], quoting Paul H. Robinson, "Mens Rea," in *Encyclopedia of Crime & Justice* 995, 995-996 [Joshua Dressler ed, 2d ed 2002]).

In this case, we are concerned with two culpable mental states defined in the Penal Law: recklessness and criminal negligence (*see* Penal Law § 15.05). Recklessness is the mens rea necessary for manslaughter in the second degree (*see* Penal Law § 125.15 [1]). Criminal negligence is the mental state necessary to support a charge of criminally negligent homicide (*see id.* § 125.10). "It is undisputed here that criminally negligent homicide is a lesser included offense of manslaughter in the second degree" (*People v Heide*, 84 NY2d 943, 944 [1994]).

I.

Here, the evidence presented to the grand jury established that defendant sold the decedent five bags of heroin on July 20, 2017 and that the decedent died of a heroin overdose on July 22, 2017. The bags were blue with no markings. Shortly after the sale on July 20, defendant sent the decedent a text message in which defendant told the decedent to "be careful." Later in the day, the decedent gave one of the blue bags of heroin that he purchased from defendant to his ex-girlfriend, who consumed some of it shortly thereafter and opined that it was "really strong and potent." She did not communicate any of this information to defendant. The decedent also used some of the heroin he purchased from defendant on July 20. The decedent's ex-girlfriend testified that she was with the decedent

on July 21 until approximately 8:30 p.m., during which time he was alive and well, and that she did not see him consume any drugs on July 21. At approximately 2:30 a.m. on July 22, police were called to the decedent's home and found him unresponsive. The coroner who was present at the autopsy testified that the decedent was pronounced dead at the scene and that the cause of death was acute heroin toxicity. The toxicology report indicated that in addition to opiates, codeine and benzodiazepines were found in the decedent's blood. The coroner testified that, although the other drugs could contribute to respiratory depression, their presence did not change the cause of death.

Empty green and blue glassine bags of unspecified quantity were found in the trash can of the decedent's bedroom at the time he died. Approximately one month later, another two empty blue bags were found on a nightstand in the decedent's bedroom. Empty blue glassine bags with no markings were recovered from defendant's vehicle, and residue from one of those bags tested positive for heroin and fentanyl. Residue from one of the empty blue bags taken from the decedent's nightstand tested positive for heroin, but not fentanyl. There was no evidence presented to the grand jury tying defendant to the green bags, nor any proof that defendant was the decedent's only heroin supplier.

Another person who purchased heroin from defendant on July 14, also in blue bags, testified that defendant warned him that the heroin was strong. That individual consumed some of the heroin on July 14 and had a typical reaction. On July 16, however, he had a strongly negative reaction when he consumed some of the same heroin. That individual later told defendant on July 21 that the heroin had "almost killed" him, but this was after defendant's sale of heroin to the decedent on July 20. Police later met with defendant, who

acknowledged being a fellow drug user.  Defendant admitted to police that he had sold the decedent five bags of heroin for $100 and had told decedent to be careful.

Defendant was indicted on charges of manslaughter in the second degree, criminal sale of a controlled substance in the third degree, criminal possession of a controlled substance in the seventh degree, and criminal possession of a hypodermic instrument.[1] Defendant moved to dismiss the indictment, contending that the evidence presented to the grand jury was legally insufficient.  County Court granted defendant's motion in part, dismissing that count of the indictment charging defendant with manslaughter in the second degree.  On the People's appeal, the Appellate Division reversed and denied defendant's motion in its entirety, with two Justices dissenting (*People v Gaworecki*, 174 AD3d 1143 [3d Dept 2019]).  A dissenting Justice granted defendant leave to appeal to this Court (34 NY3d 940 [2019]).  We now reverse.

## II.

## A.

"To dismiss [or reduce] an indictment on the basis of insufficient evidence before a Grand Jury, a reviewing court must consider whether the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury" (*People v Grant*, 17 NY3d 613, 616 [2011] [internal quotation marks omitted]). "In the context of a Grand Jury proceeding, legal sufficiency means prima facie proof of

---

[1] The prosecutor had instructed the grand jury to consider criminally negligent homicide separately, rather than a lesser included offense of manslaughter in the second degree, and the grand jury "no-billed" the charge of criminally negligent homicide.

the crimes charged, not proof beyond a reasonable doubt" (*id.* [internal quotation marks omitted]).

The standard, while deferential, is not meaningless. "The Legislature has defined legally sufficient evidence as 'competent evidence which, if accepted as true, would establish every element of an offense charged' " (*id.*, quoting CPL 70.10 [1]). Upon review, we must determine "whether the facts, if proven, and the inferences that logically flow from those facts supply proof of every element of the charged crimes, and whether the Grand Jury could rationally have drawn the guilty inference" (*id.* [internal quotation marks omitted]).

With respect to manslaughter in the second degree, the People were required to present competent evidence establishing that defendant "recklessly cause[d] the death" of the decedent (Penal Law § 125.15 [1]). A defendant acts recklessly in this context if the defendant "is aware of and consciously disregards a substantial and unjustifiable risk" that death will result (Penal Law § 15.05 [3]; *see People v Li*, 34 NY3d 357, 368 [2019]). "The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). With respect to the lesser included offense of criminally negligent homicide, the People must demonstrate that defendant, acting with "criminal negligence," caused the decedent's death (Penal Law § 125.10). A defendant acts with criminal negligence in this context when the defendant "fails to perceive a substantial and unjustifiable risk" that death will result (*id.* § 15.05 [4]). Criminal negligence also requires the defendant's conduct to be "a gross deviation from the standard of care that a reasonable

person would observe in the situation" (*id*.).

Both recklessness and criminal negligence "require that there be a 'substantial and unjustifiable risk' that death or injury will occur; that the defendant engage in some blameworthy conduct contributing to that risk; and that the defendant's conduct amount to a 'gross deviation' from how a reasonable person would act" (*People v Asaro*, 21 NY3d 677, 684 [2013], quoting Penal Law § 15.05).  "The only distinction between the two mental states is that recklessness requires that the defendant be 'aware of' and 'consciously disregard' the risk while criminal negligence is met when the defendant negligently fails to perceive the risk" (*id.*).  As we have recognized, the underlying conduct for both offenses is the same and involves some degree of risk creation (*see People v Boutin*, 75 NY2d 692, 696 [1990]).  In this regard, we have observed that the " 'nonperception' of a risk, even if death results, is not enough"—rather, the defendant must have "engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of death" (*id.*).

Our case law involving criminal liability for overdose deaths informs the application of these standards.   We have explained that a person who, "with the requisite mens rea, engages in conduct through the sale or provision of dangerous drugs that directly causes the death of a person" may be prosecuted for manslaughter in the second degree or criminally negligent homicide (*Li*, 34 NY3d at 363).  For example, in *People v Cruciani* (36 NY2d 304 [1975]), we affirmed the defendant's conviction of manslaughter in the second degree, concluding that he "recklessly" caused the death of the victim (*see id.* at 305).  There, the defendant injected the decedent with heroin when he knew that she was

already "completely bombed out" and had "lost the capacity to walk or talk straight," and he had admitted his awareness that there was a "substantial possibility" that the heroin with which he injected her would cause her to "fall out" (that is, die) (*id.* at 305 [internal quotation marks omitted]; *see also People v Galle*, 77 NY2d 953, 955-956 [1991]).

In cases without such evidence of "the requisite mens rea" (*Li*, 34 NY2d at 363), however, the defendant may not be prosecuted for a homicide offense. For instance, in *People v Pinckney* (38 AD2d 217 [2d Dept 1972], *affd without opinion* 32 NY2d 749 [1973]), we upheld the Appellate Division's decision holding that an indictment alleging a one-time sale of heroin and the provision of needles was insufficient to support a charge of second-degree manslaughter or criminally negligent homicide (*see* 38 AD2d at 218-221; *see also Cruciani*, 36 NY2d at 305-306 [distinguishing *Pinckney*]).

B.

We conclude that the evidence presented to the grand jury failed to establish a prima facie case that defendant acted either with the recklessness required to sustain the charge of second-degree manslaughter or the criminal negligence required to sustain the lesser included offense of criminally negligent homicide.

The evidence demonstrated that defendant knew that the heroin he sold the decedent was strong and required caution. That the heroin was potent, however, does not equate to a substantial and unjustifiable risk that death would result from the use of the heroin. The coroner, the decedent's ex-girlfriend, and the other individual who purchased heroin from defendant all testified that it was common knowledge among heroin users that different samples or preparations of heroin had different potencies and that the strength of heroin

could vary a great deal among samples. The People's evidence demonstrated that the decedent, his ex-girlfriend, and the other individual all used the same sample of heroin purchased from defendant before July 22 and survived those encounters.

More importantly, the People presented insufficient evidence that defendant was aware of, or failed to perceive, a substantial and unjustifiable risk of death from the heroin he was selling before July 20, when he sold heroin to the decedent. The People presented no evidence that defendant had been told that other people had overdosed or died after using the heroin he had sold them. Although one of the bags of heroin recovered from defendant's vehicle tested positive for heroin and fentanyl, there was no evidence that the heroin defendant sold to the decedent also contained fentanyl, or, if it did, that defendant had cut or packaged the drugs himself or that he was otherwise aware that the heroin he sold may have contained fentanyl. Although another person who purchased heroin from defendant told defendant that the heroin had "almost killed" him, he did not inform defendant of this fact until July 21, after defendant had sold the heroin to the decedent.

In sum, defendant's knowledge that the heroin was strong and required caution, if unexplained and uncontradicted at trial and viewed in the light most favorable to the People, would not warrant conviction by a petit jury because it does not lead to a rational inference that defendant was aware that the potency of the heroin was such that its sale posed a substantial and unjustifiable risk of death, or that defendant failed to perceive that it did (*see* Penal Law § 15.05 [3], [4]; *cf. Galle*, 77 NY2d at 955-956; *Cruciani*, 36 NY2d at 305). The People failed to present any evidence of defendant's awareness of any real threat to the decedent's life "beyond the general knowledge of the injuriousness of drug-

taking" (*Cruciani*, 36 NY2d at 305-306). For the same reason, the People failed to establish that defendant's conduct was a "gross deviation from the standard of care that a reasonable person would observe in the situation," as required for both second-degree manslaughter and criminally negligent homicide (*see* Penal Law § 15.05 [3], [4]).

C.

Contrary to the People's assertion, this case is readily distinguishable from *People v Li* (34 NY3d 357 [2019]). There, we upheld the defendant's conviction of two counts of manslaughter in the second degree after two of his patients at a "pill mill" overdosed and died as a result of ingesting controlled substances that the defendant had prescribed to them. The defendant in *Li* was a medical doctor board-certified in anesthesiology and pain management, with ample knowledge of the effects of opioids and other drugs (*see id.* at 360-361). Despite this knowledge, the defendant typically "prescribed medically unnecessary high doses of opioids, alprazolam, and other controlled substances as a first resort," without verifying patients' complaints of pain, ordering diagnostic tests, or considering other options for pain management (*see id.*). The defendant was specifically "advised by other medical practitioners and patients' family members that several of his patients were addicted to opioids and at risk of dying from opioid abuse" (*see id.* at 361).

With respect to the defendant's two patients who died, the evidence presented at trial established that the defendant prescribed Xanax to the decedents without any documented medical basis, despite his knowledge that Xanax taken in combination with high doses of opioids could depress respiratory function and increase the likelihood of overdose death (*see id.* at 365-367). The defendant performed little to no diagnostic

workup for the decedents and did not consider any non-opioid pain management treatment options (*see id.* at 366-367). The defendant prescribed the decedents high and increasing doses of opioids and Xanax, despite his awareness of their synergistic respiratory depression effects (*see id.* at 366-368). The defendant continued to write prescriptions for the decedents that the People's expert testified was designed to create a "cycle of craving and withdrawal," even after both decedents returned early for their medications, which should have alerted the defendant that they were not taking their medications as prescribed (*id.*). The People's expert further testified that the prescription the defendant wrote for each decedent a few days before their respective overdose deaths created a high probability of overdose and death (*see id.* at 367-368).

In *Li*, the People presented ample evidence that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that the decedents would die from abusing the medications he prescribed them (*see id.* at 368). We further concluded that, "given defendant's position as their medical doctor," the defendant's conduct constituted a gross deviation from the standard of care that a reasonable person would observe in the situation (*see id.*). Here, by contrast, although the People presented evidence that defendant sold heroin to the decedent, they failed to present prima facie proof, "beyond the general knowledge of the injuriousness of drug-taking" (*Cruciani*, 36 NY2d at 305), of additional circumstances that would warrant the conclusion that defendant was aware of and consciously disregarded that his conduct posed a substantial and unjustifiable risk of death, or that defendant failed to perceive such a substantial and unjustifiable risk.

III.

Inasmuch as we have concluded that the evidence presented to the grand jury was legally insufficient to establish the requisite mens rea for second-degree manslaughter or the lesser included offense of criminally negligent homicide, we do not address the separate question of whether the People's evidence was legally sufficient to establish that defendant caused the decedent's death, another necessary element of both crimes. We also do not address defendant's contention that the prosecutor's instructions to the grand jury with respect to those counts were so incomplete or misleading that they undermined the essential function of the grand jury (*see People v Calbud, Inc*., 49 NY2d 389, 396 [1980]). Defendant's remaining contentions are either unpreserved or rendered academic by our determination.

Accordingly, the order of the Appellate Division should be reversed, and defendant's motion insofar as it sought to dismiss the count in the indictment charging manslaughter in the second degree granted.

Order reversed and defendant's motion insofar as it sought to dismiss the count in the indictment charging manslaughter in the second degree granted. Opinion by Judge Fahey. Chief Judge DiFiore and Judges Rivera, Garcia, Wilson, Singas and Cannataro concur.

Decided October 7, 2021